NO.   95-384

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

     Plaintiff and Appellant,

  v.

DONALD SCHNITTGEN,

     Defendant and Respondent.

FILED

JUL 30 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Seventeenth Judicial District,
In and for the County of Phillips,
The Honorable Leonard H. Langen, Judge presiding.


COUNSEL OF RECORD:

     For Appellant:

          Joseph P. Mazurek, Attorney General, Elizabeth L.
Griffing and Brenda Nordlund, Assistant Attorneys
General, Helena, Montana; Mark J. Murphy, Special
Phillips County Attorney, Helena, Montana; Ed
Amestoy, Phillips County Attorney, Malta, Montana

     For Respondent:

          David L. Irving, Glasgow, Montana; Elizabeth A.
Best, Best Law Offices, Great Falls, Montana

Heard:      May 7, 1996
Submitted:  May 9, 1996
Decided:    July 30, 1996

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

The state of Montana appeals from a judgment of the Seventeenth Judicial District Court, Phillips County, dismissing a criminal charge against Donald Schnittgen (Schnittgen). Schnittgen was charged with criminal mischief as a result of an incident at a bar in Zortman, Montana. Based on his behavior the same evening, Schnittgen was subsequently terminated from his position as deputy sheriff. Schnittgen moved to dismiss the criminal charge contending that his prosecution violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution. After holding an evidentiary hearing on the motion, the District Court entered findings of fact, conclusions of law, and order dismissing the charge of criminal mischief as violative of Schnittgen's constitutional right against double jeopardy. We reverse.

## ISSUE.

Did the District Court err in dismissing the felony criminal mischief charge filed against Schnittgen on the basis that it violated the constitutional prohibition against double jeopardy?

## BACKGROUND

On March 29, 1994, Schnittgen, a deputy sheriff in Phillips County, allegedly damaged substantial property at the Miner's Club Bar in Zortman, Montana. Schnittgen was off-duty at the time. He was at the bar with a friend, James Lile, when the Phillips County

2

undersheriff and a deputy arrested Lile for criminal trespass because Lile refused to leave the bar after repeated requests. Schnittgen verbally abused the officer who arrested Lile. upon returning from taking Lile to the county jail, the officers heard over the radio dispatch that Schnittgen was breaking things at the bar. Undersheriff Weber and Officer Sandsness called for backup and waited for Sheriff Peigneux and Deputy Miller to arrive. When the sheriff arrived, Schnittgen locked the door to the bar. After nearly a half an hour, Schnittgen agreed to come out of the bar and went to the county jail in Malta with Sheriff Peigneux and Deputy Miller. Schnittgen sprayed catsup and mustard on the jail surveillance camera in his cell, causing damage to the camera.

On March 31, 1994, Schnittgen was charged with criminal mischief, a felony, in violation of § 45-6-101(1), MCA, for damaging the property of the Miner's Club Bar and was served with a complaint and notice to appear. Schnittgen appeared before Gayle Stahl, Justice of the Peace, and was later released on a $5,000 bond. Immediately following this incident, Phillips County suspended Schnittgen without pay but subsequently changed his status to leave with pay.

On May 9, 1994, a specially-appointed deputy county attorney charged Schnittgen by information with criminal mischief, a felony, in violation of § 45-6-101, MCA, for damaging the bar in an amount exceeding $15,000. On June 2, 1994, at Schnittgen's initial appearance, the District Court appointed a public defender to represent him, released the bail he had posted, and released him on

his own recognizance.   At his arraignment on October 4, 1994, Schnittgen entered a "not guilty" plea and gave notice that he would use the defense of mental disease or defect

On December 1, 1994, the Phillips County Attorney sent a letter to Schnittgen giving him notice of the Phillips County Sheriff's intent to terminate Schnittgen's employment and setting a date for a hearing before the Phillips County Board of Commissioners.   The county attorney enclosed an affidavit disclosing, in summary, the following causes for Schnittgen's termination:    disobeying   the   orders   of   the   Sheriff   and Under-sheriff;   insubordination   to   superior   officers;   criminal mischief to Phillips County property by damaging the jail cell camera; placing fellow officers in a hazardous situation;  and incapacity materially affecting his ability to perform his official duties

More  specifically,  the termination notice set  forth the following as reasons for the termination proceeding:

> a.   After making an arrest on James Lile, a friend of Deputy Schnittgen, Undersheriff Bryan Weber indicated that Deputy Schnittgen became verbally abusive to Undersheriff Weber. Undersheriff Weberinstructed Deputy Schnittgen to go home, to which Deputy Schnittgen replied "Is that a [f___]ing order boss?"  Undersheriff  Weber affirmed that it was an order to which Deputy Schnittgen replied, "Who's going to make me?"  Deputy Schnittgen did not obey the order of the Undersheriff and remained at the scene. Deputy Schnittgen was ordered by Sheriff Gene Peigneux to remove himself from the bar and return to Malta.  Deputy Schnittgen disobeyed the order of the Sheriff and continued to destroy property in the bar until a later time when he was finally convinced to go with the Sheriff and the Deputies.  By these actions, Deputy Schnittgen disobeyed the reasonable orders of the Undersheriff and Sheriff.

4

b.   While completing the arrest on Deputy Schnittgen's friend, Jim Lile, at the Zortman Bar, Deputy Schnittgen was insubordinate and verbally abusive to Undersheriff Weber by challenging him and telling him that he should quote "Suck [d I." Deputy Schnittgen was also insubordinate to Sheriff Peigneux by failing to cease and desist his activities inside the Zortman Bar after the arrival of Sheriff Peigneux.

c.   While off duty on the date in question, Deputy Schnittgen was drunk and disorderly and destroyed the property of the owners of the Zortman Bar. The estimated damages to the Zortman Bar as a result of Deputy Schnittgen's action was in the amount of $15,000. Subsequently, Deputy Schnittgen was charged with a felony offense and the trial in such criminal case in [sic] currently pending before the Seventeenth Judicial District Court.

d.   Deputy Schnittgen was arrested and placed in the Phillips County Jail after the incident in Zortman. While in the Phillips County Jail, Deputy Schnittgen damaged county property by rubbing ketchup and mustard on a jail cell camera. Such abuse to the camera caused it to malfunction and required it to be sent in for repair.

e.   Deputy Schnittgen placed himself as well as other deputy sheriff's [sic] in a hazardous situation when he would not leave the bar area with the law enforcement officers and also by challenging the officers and telling the officers to shoot him while he was in the bar area.

f.   The violent and destructive outburst displayed by Deputy Schnittgen on March 29, 1994, which resulted in a substantial amount of damage to the Zortman Bar, the challenging of fellow officers, the disobedience to the Sheriff and the Undersheriff and the damaging of Phillips County property displays an incapacity on Deputy Schnittgen's part which materially effects [sic] his ability to perform his official duties as a deputy sheriff.

Schnittgen attended the hearing without counsel and read a statement that his participation in the hearing would violate his constitutional rights. On December 20, 1994, Phillips County terminated Schnittgen's employment.

On March 13, 1995, in the criminal proceedings, Schnittgen

served a written notice of his intent to use the defense of mental disease or defect. He amended his notice on June 7, 1995, listing expert witnesses in support of this defense. The District Court appointed an additional expert to advise the defense, to assess medical records, and to coordinate expert testimony at trial. On June 15, 1995, Schnittgen moved to dismiss the criminal charge against him, claiming that his prosecution violated the Double Jeopardy Clause because the same conduct underlying the criminal prosecution formed the basis for Phillips County's termination of his employment. The State opposed the motion, claiming it was untimely filed and arguing that double jeopardy case law does not extend to a termination of employment.

Following a pretrial hearing, the District Court postponed consideration of Schnittgen's motion to dismiss and other pretrial motions until July 11, 1995. Following the July 11, 1995, hearing, the District Court entered findings of fact, conclusions of law, and order dismissing the charge of criminal mischief on the basis that the charge violated the Double Jeopardy Clauses of the United States and Montana Constitutions.

The State appeals the District Court's findings of fact, conclusions of law, and order.

STANDARD OF REVIEW

Whether the Double Jeopardy Clause is implicated in a course of conduct against an individual by the government is a question of constitutional law. Therefore, our standard of review is plenary. See United States v. Tolliver (5th Cir. 1995), 61 F.3d 1189, 1209, rev'd on other grounds, Sterling v. United States (1996), 116 S.Ct.

TOO, 133 L.Ed.2d 834. We review a district court's conclusions of law to determine if the court's interpretation of the law is correct. State v. Gould (1995), 273 Mont. 207, 219, 902 P.2d 532, 540.

DISCUSSION

Did the District Court err in dismissing the felony criminal mischief charge filed against Schnittgen on the basis that it violated the constitutional prohibition against double jeopardy?

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." **Similarly,** Article II, Section 25 of the Montana Constitution provides that no person shall "be again put in jeopardy for the same offense previously tried in any jurisdiction." While the language of the Double Jeopardy Clauses in the federal and State constitutions is somewhat different, that difference is not material to our decision here. Accordingly, for purposes of this opinion, we treat the protections from double jeopardy afforded under both constitutions as co-extensive and will simply refer to both clauses collectively in the singular. See State v. Nelson (Mont. 1996), 910 P.2d 247, 250, 53 St.Rep. 50, 51-52.

The United States Supreme Court has on numerous occasions held that the Double Jeopardy Clause protects against three distinct abuses: 1) a second prosecution for the same offense; 2) a second prosecution for the same offense after conviction; and 3) multiple punishments for the same offense. United States v. Halper (1989),

7

490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487, 496 (citing North Carolina v. Pearce (1969), 335 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664-65); see also Witte v. United States (1995), 115 S.Ct. 2199, 2204, 132 L.Ed.2d 351, 361.

In the instant case, Schnittgen contends that the criminal prosecution violated the Double Jeopardy Clause's protection against multiple punishments for the same offense because the same conduct underlying the criminal prosecution formed the basis for the termination of his employment.  On the other hand, the State contends that the District Court erred in dismissing the criminal charges against Schnittgen because Schnittgen's employment termination and his criminal prosecution did not constitute multiple punishments.  Specifically, the State contends that Phillips County was driven by purposes other than punishment in terminating Schnittgen's employment and, therefore, the Double Jeopardy Clause does not apply.

Whether the Double Jeopardy Clause prohibits the government from discharging a public employee from his employment for conduct which also gives rise to the filing of criminal charges against him is an issue of first impression before this Court.  Notwithstanding, four United States Supreme Court cases, two federal circuit court cases, and a state supreme court case shed light on this question and guide our analysis.  See, Halper, 490 U.S. 435; Austin v. United States (1993), 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488; Department of Revenue v. Kurth (1994), 114 S.Ct. 1937, 128 L.Ed.2d 767; United States v. Ursery (U.S. June 24, 1996), Nos. 95-345 and 95-346; United States v. Reed (11th Cir. 1991), 937 F.2d

8

575; United States v. Payne (6th Cir. 1993), 2 F.3d 706; Loui v. Board of Medical Examiners (Hawaii 1995), 889 P.2d 705. Accordingly, a review of these cases is appropriate.

Historically, the protection against double jeopardy applied only to criminal proceedings. See, e.g., United States ex rel. Marcus v. Hess (1943), 317 U.S. 537, 548-49, 63 S.Ct. 379, 386, 87 L.Ed. 443, 450. However, in Halper, in what has now become a seminal case, the United States Supreme Court recognized the "intrinsically personal" character of the Fifth Amendment right and applied the proscription against multiple punishments to a penalty authorized by the civil False Claims Act, holding that civil as well as criminal sanctions may constitute punishment for double jeopardy purposes. Halper, 490 U.S. at 441.

Specifically, the Halper Court considered "whether and under what circumstances a civil penalty may constitute 'punishment' for the purposes of double jeopardy analysis," noting that "[i]t is well settled that 'Congress may impose both a criminal and a civil sanction in respect to the same act or omission.'" Ursery, Nos. 95-345 and 95-346, slip op. at 24 (quoting Helvering v. Mitchell (1938), 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917, 922). However, the Court went on to hold that "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." Halper, 490 U.S. at 448-49.

In _Halper_, the defendant had been indicted and convicted for submitting false medicare claims in violation of the federal false claims statute and had been sentenced to prison for 2 years and fined $5,000. The government then brought a civil action against the defendant under the civil False Claims Act. _Halper_, 490 U.S. at 437. The federal district court granted summary judgment in favor of the government but found that imposing the full statutory penalty of more than $130,000 would constitute double jeopardy because, in application, the amount of the penalty was entirely unrelated and disproportionate to actual damages suffered by the government.

The parties did not dispute that the defendant had already been punished in a prior criminal proceeding, nor did they dispute that the civil and criminal proceedings concerned the same conduct --submission of 65 false claims. Rather, the sole issue was whether the statutory penalty authorized by the civil False Claims Act constituted punishment for the purposes of double jeopardy. _Halper_, 490 U.S. at 441. The Court noted that civil enforcement of a remedial sanction does not constitute double jeopardy. _Halper_, 490 U.S. at 441 (citing _Helvering_, 303 U.S. 391). Accordingly, the Court held that to identify a violation of the Double Jeopardy Clause's proscription against multiple punishments, a court should assess the character of the actual sanctions imposed on an individual by the machinery of the state. Importantly, whether a sanction constitutes punishment is not determined from the defendant's perspective but rather by "the purposes actually served by the sanction in question." _Halper_, 490 U.S. at 447 n 7. For

10

example, the Court noted that a sanction designed to protect the government from financial loss rather than to vindicate public justice was civil in nature. Halper, 490 U.S. at 444 (citing U.S. ex rel. Marcus v. Hess, 317 U.S. 537).

Under the Court's analysis in Halper, the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. A sanction constitutes punishment when, as applied to an individual, it serves the goals of punishment. Halper, 490 U.S. at 448. Since punishment serves the two goals of retribution and deterrence, a civil sanction which serves only retributive or deterrent purposes constitutes punishment. Halper, 490 U.S. at 448. However, the Court also carefully limited its holding in Halper to the "rare case" in which a fixed penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused--a point which, for the most part, was lost in the plethora of double jeopardy cases that followed in Halper's wake.

Following Halper, in another case involving criminal charges and a civil forfeiture arising out of the same incident, the United States Supreme Court considered whether a civil forfeiture could violate the Excessive Fines Clause of the Eighth Amendment to the Constitution, which provides that "excessive bail shall not be required, nor excessive fines imposed . ." Austin, 509 U.S. at 605. In Austin, the government initiated civil forfeiture proceedings against a body shop and mobile home owner after the

11

owner pleaded guilty to possessing cocaine with intent to distribute. The defendant contested the forfeiture based on the Excessive Fines Clause, but the district court and the court of appeals held the forfeiture constitutional. Ursery, Nos. 95-345 and 95-346, slip op. at 12. The Court limited its review to the question of "whether the Excessive Fines Clause of the Eighth Amendment applies to forfeitures of property under 21 U.S.C. §§881(a)(4) and (a)(7)" and more specifically whether a forfeiture under §§881(a)(4) and (a)(7) constituted punishment for purposes of the Eighth Amendment. Austin, 509 U.S. at 610. The Court held that forfeiture under §§881(a)(4) and (a)(7) is subject to the limitations of the Eighth Amendment's Excessive Fines Clause. Austin, 509 U.S. at 622.

In its next related double jeopardy case, the United States Supreme Court considered the question of whether a state tax imposed on marijuana violated the Double Jeopardy Clause when the taxpayer had already been criminally convicted of owning the marijuana for which he was taxed. Kurth, 114 S.Ct. at 1941. In that case, the Court granted certiorari because our decision in Sorensen v. State Dep't of Revenue (1992), 254 Mont. 61, 836 P.2d 29, upholding the Montana Drug Tax as not being excessive was "directly at odds with the conclusion reached in the federal proceedings involving the Kurths," to the effect that the tax punished the Kurths a second time for the same conduct. Kurth, 114 S.Ct. at 1944. The Kurth Court questioned whether Montana's drug tax was so punitive as to constitute a punishment subject to the Double Jeopardy Clause. The tax was conditioned on the commission

12

of a crime, was imposed after the taxpayer had been arrested, and was imposed on a taxpayer after the marijuana had been confiscated and presumably destroyed at the time the tax was imposed. These factors led the Court to hold that the tax was motivated by a "penal and prohibitory intent rather than the gathering of revenue." Kurth, 114 S.Ct. at 1947.

Concluding that the Montana tax proceeding was the functional equivalent of a successive criminal prosecution, the Court upheld the federal district court judgment barring the tax. The Court stated that Montana's tax being conditioned on the commission of a crime was significant of penal and prohibitory intent. Moreover, the Court noted that because tax statutes served a purpose different from civil penalties, it concluded that the Halper test for civil penalties did not apply to tax statutes. Rather, the Court's central inquiry was whether the sanction imposed was rationally related to the damages the government suffered. Kurth, 114 S.Ct. at 1944. The Court held that Montana's drug tax was not the kind of remedial sanction that may follow the punishment of a criminal offense, but instead, constituted a second punishment prohibited by the double jeopardy provision of the Constitution.

Faced with the Halper, Austin, and Kurth trilogy, in cases too numerous to mention, federal and state courts (including this Court) have tried in varying ways to apply the principles enunciated by the Supreme Court to factually diverse situations involving civil sanctions and criminal charges arising from the same incident. See, i.e. Sorensen, 836 P.2d 29 (effectively overruled by Kurth); Stuart v. Dept. of Social and Rehab. Serv.

13

(1993), 256 Mont. 231, 846 P.2d 965 (discussed later in this opinion); and Nelson, 910 P.2d 247 (involving inmates being convicted of criminal escape subsequent to their administrative forfeiture of good time for the same conduct).

Important to our discussion here, however, are two circuit courts of appeal decisions wherein the courts were faced with double jeopardy claims based on fact situations specifically related to employment situations. In both cases, the courts distinguished Halper while, at the same time, applying its general principles.

In Reed, the Eleventh Circuit held that a disciplinary suspension imposed on a government employee at an arbitration proceeding did not implicate double jeopardy concerns where a subsequent prosecution for embezzlement was based on the same underlying conduct. Reed, 937 F.2d at 578. In that case, the defendant was discharged from his job as a letter carrier after the Postal Service accused him of misappropriating money he received from postal customers for COD parcels. Reed, 937 F.2d at 576. The defendant filed a grievance challenging his termination and initiated binding arbitration. Reed was subsequently charged by criminal indictment. The government conceded that the criminal prosecution concerned the same conduct at issue in the arbitration proceeding. Relying heavily on Halper, the defendant argued that the criminal prosecution following the disciplinary suspension violated the Double Jeopardy Clause's protection against multiple punishments for the same offense.

14

The _Reed_ court held that _Haloer_ announced a rule for the "rare case" and did not apply to the disciplinary suspension at issue. Specifically, the court concluded that the civil sanction was not imposed according to a statutory fixed-penalty provision, as in _Halper_, but, rather, as a result of a binding arbitration decision. Moreover, the court stated that because no damage award was imposed on the defendant, the _Halper_ test necessitating a balancing of money damages with the government's loss was inapposite to the facts. _Reed_, 937 F.2d at 577.

Notwithstanding, the court did look to _Haloer_ in framing its double jeopardy analysis noting that "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." _Reed_, 937 F.2d at 577 (quoting _Halper_, 490 U.S. at 448). Importantly, the court held that the sanction of suspension from employment was an attempt to vindicate the contract rights of the government and the defendant and therefore served "legitimate nonpunitive governmental objectives" and was by its nature remedial. _Reed_,937 F.2d at 578. The court also noted that while the disciplinary suspension may carry the sting of punishment for the defendant, the Court in _Halper_ stated that whether a civil sanction amounts to punishment for double jeopardy purposes is not determined from the defendant's perspective. Moreover, the court concluded that the application of the _Halper_ test to a disciplinary suspension would work an absurd result.

15

> If such was the law, then a government employee targeted by a criminal prosecution for actions taken within the scope of his employment could pursue arbitration, where that was an option, and thereby possibly avoid criminal sanctions greater in severity than any arbitrator's decision. We will not offer up the Double Jeopardy Clause as a forum-shopping tool for government employees who have violated the law.

Reed, 937 F.2d at 578.

The Sixth Circuit followed the reasoning of Reed. See Payne, 2 F.3d 706. In Payne, the court held that an administrative termination did not amount to punishment for double jeopardy purposes because the postal service dismissed the employee for the legitimate purpose of enforcing its employment contract. Payne, 2 F.3d at 710-11. In Payne, a grand jury charged defendant with soliciting bribes, attempting to solicit bribes, obstructing mail, and deserting mail. A jury found the defendant guilty of obstruction and desertion of mail. Before the federal indictment, the United States Post Office administrator had removed the defendant from employment for substantially the same allegations as the federal indictment. Payne, 2 F.3d at 708, 710.

Payne contended that the Double Jeopardy Clause prevented the government from bringing criminal charges against him because the postal service had already punished him by removing him from its employment. The court however analogized to Reed and held that since the suspension from employment served "legitimate nonpunitive governmental objectives under the employment contract, it did not amount, to punishment for double jeopardy purposes." Payne, 2 F.3d at 710.

16

Similarly, in a somewhat related context, the Supreme Court of Hawaii recently addressed the issue of whether a suspension of a doctor's medical license based on his conviction for attempted first-degree sexual abuse and kidnapping violated the Double Jeopardy Clause. Loui, 889 P.2d at 707. The doctor relied mainly on Halper to argue that the suspension of his medical license after he had been previously sentenced by the circuit court violated the Fifth Amendment's protection against multiple punishments for the same offense. Loui contended that the purpose of the suspension was to deter him from committing the same offense again and served no remedial purpose but could only be characterized as retribution. Loui, 889 P.2d at 710.

The Hawaii Supreme Court rejected the doctor's argument. Rather, the court viewed Halper as applying mainly to instances where the government seeks monetary damages unrelated to the goal of making the government whole by way of a civil proceeding against an individual who has already been criminally punished for the same offense. Loui, 889 P.2d at 711. The court distinguished Halper, noting that the suspension of a doctor's license did not involve monetary damages and thus the Halper test that "requires a comparison between the civil penalty and the government's loss resulting from defendant's conduct" did not apply. Loui, 889 P.2d at 711 (citing Reed, 937 F.2d at 577). Instead, the court looked to the broad principle of determining the purpose actually served by the sanction in question. In Loui, the court concluded that the suspension was designed to protect the public from unfit physicians and therefore served legitimate nonpunitive governmental objectives

17

and thus did not amount to a violation of the Double Jeopardy Clause. Loui, 889 P.2d at 711-13.

Likewise, while not directly on point, this court has tangentially considered the application of the Double Jeopardy Clause to an employment situation. In Stuart, we considered and rejected the appellant's claim, based on Halper, that the Montana Department of Social and Rehabilitative Services' refusal to pay employees for their accrued vacation following their termination for cause violated the Double Jeopardy Clause within the particular statutory context in which the case arose. Stuart, 846 P.2d at 968-69.

We noted that in Halper, the government sought to enforce an actual statutory civil sanction or penalty against a person who had already been punished in a criminal prosecution. Stuart, 846 P.2d at 969. We determined that Halper was inapposite and focused our analysis on the question of whether the statute at issue, § 2-18-617, MCA, constituted a civil sanction. "'Sanction' is defined by the Webster's Third New International Dictionary as the 'detriment, loss of reward, or other coercive intervention that is annexed to a violation of a law as a means of enforcing the law . .'" Stuart, 846 P.2d at 969. We concluded that while the facts in Halper clearly met the definition, in Stuart there was no subsequent proceeding annexed to a violation of any law and therefore the State's refusal to compensate the appellants for their accrued vacation leave did not constitute a civil sanction. "Failure to satisfy a condition does not equate to violating a law

18

and facing an additional enforcement proceeding." Stuart, 846 P.2d at 969.

As is apparent from the foregoing discussion, in the context of scenarios (including employment situations), where the facts are distinguishable and where the differing goals of civil vs. criminal sanctions are evident, courts faced with Halper-based double jeopardy claims have attempted to more narrowly apply the broad general principles enunciated in that case, as further expanded or narrowed, depending upon one's perspective, in Austin and Kurth. Importantly, that approach is consistent with the Supreme Court's most recent double jeopardy ruling in Ursery wherein the Court clarified and narrowed the breadth of its holdings in Halper, Austin, and Kurth. Moreover, of particular interest in the instant case, the Court's analysis in Ursery supports the approaches and decisions of the courts in Reed, Payne, and Loui. Ursery, Nos. 95-345 and 95-346, slip op. at 14.

In Ursery, police found marijuana growing adjacent to the defendant's house and discovered seeds, stems, a growlight, and other marijuana paraphernalia. The police subsequently initiated forfeiture proceedings against the house. Before the forfeiture settlement had been reached, the defendant was indicted, convicted, and sentenced for manufacturing marijuana. The court of appeals held that the criminal conviction violated the Double Jeopardy Clause, basing its decision on its analysis that Halper and Austin meant that civil forfeiture under §881(a)(7) constitutes punishment for purposes of the Double Jeopardy Clause and more specifically,

19

that the defendant had been punished in the forfeiture proceeding and could not subsequently be criminally tried.

Disagreeing, the Supreme court noted that "[s]ince the earliest years of this Nation, Congress has authorized the Government to seek parallel *in* rem civil forfeiture actions and criminal prosecutions based upon the same underlying events." Ursery, Nos. 95-345 and 95-346, slip op. at 5. The Court delineated the question as whether a forfeiture proceeding is by its nature criminal and punitive or civil and remedial. According to Ursery, that inquiry is two-fold. First, the Court looked to Congress' intent: whether such proceedings had traditionally been viewed as civil proceedings; whether such proceedings reached a broader range of conduct than their criminal analogue; and whether such proceedings furthered broad remedial aims. Second, the Court looked to whether the statutory scheme was so punitive either in purpose or effect as to negate Congress' intention to establish a civil remedial mechanism which balances the government's harm against the size of the penalty. Ursery, Nos. 95-345 and 95-346, slip op. at 9.

The Court concluded that civil forfeiture does not qualify as an additional penalty for the commission of a criminal act, but rather as a separate civil sanction that is remedial in nature. The Court carefully distinguished in personam penalties from in rem forfeitures. The Court accordingly limited Halper's double jeopardy rule to civil penalties. "Civil penalties are designed as a rough form of 'liquidated damages' for the harms suffered by the Government as a result of a defendant's conduct." Ursery, Nos. 95-

20

345 and 95-346, slip op. at 15. The Court determined that civil forfeitures, in contrast to civil penalties, do more than simply compensate the government. The Court observed that it is virtually impossible to quantify, even approximately, the nonpunitive purposes served by a particular civil forfeiture. Therefore, according to the Court, as a practical matter, it is difficult to determine whether a particular forfeiture bears a rational relationship to the nonpunitive purposes of that forfeiture or whether it does not. Urserv, Nos. 95-345 and 95-346, slip op. at 16. In a footnote answering Justice Stevens' dissent, the majority clarified that for a second sanction to pass constitutional muster, it may be partly deterrent or retributive, but must be at least in part remedial.

Importantly, the Urserv Court stated that it would not apply the Halper analysis outside the context of a fixed-penalty provision, and noted that it had declined to apply Halper's method of determining whether a penalty is remedial or punitive to Kurth because Kurth involved a tax statute and not a fixed-penalty provision. The Court also expressly limited its holding in Austin to the Excessive Fines Clause of the Eighth Amendment and declined to import the analysis of Austin into double jeopardy jurisprudence. In summary, the Court effectively narrowed Halper, Kurth, and Austin to their specific fact situations.

Turning, then, to the instant case, the District Court relied on Kurth to conclude that Schnittgen's termination from employment constituted a disproportionately severe civil punishment arising out of the precise conduct for which he was criminally prosecuted

21

and that the criminal charge therefore violated the Double Jeopardy Clause's proscription against multiple punishments for the same offense. The State argues that the District Court erred in applying Kurth's analysis to the instant case and further contends that Halper also is distinguishable from the facts before us. We agree.

In line with Reed, Payne, and Loui and the Supreme Court's narrower interpretation of Halper, Austin, and Kurth in Urserv, we conclude that the instant case is not controlled by the latter trilogy. As pointed out above, in Halper, the Court announced

> a rule for the rare case . . where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused.

Halper, 490 U.S. at 1902.

The instant case does not present the "rare case" envisioned in Halper nor does it implicate a fixed-penalty provision of a statutory scheme. Rather, this case involves an employment termination arising out of an incident wherein the employee's alleged conduct that resulted in his termination also subjected him to criminal prosecution. On this ground, alone, Halper is factually distinguishable. In the instant case, contrary to the conclusion of the trial court, Schnittgen was not subject to a sanction "overwhelmingly disproportionate" to the damages he caused. An employment termination is not a sanction that can readily be measured as proportionate or disproportionate to the "damages caused." It is obvious that an employee may be **legitimately** discharged from his employment for reasons that do not

22

involve his having caused any "damage," as such. Similarly, an employment termination is not normally characterized in terms of being either a "fine" or a "penalty."

Furthermore, the instant case does not implicate the Eighth Amendment and, therefore, Austin is clearly inapplicable. Urserv, Nos. 95-345 and 95-346, slip op. at 15. Additionally, in contrast to Kurth, the instant case does not involve a tax. Even in Kurth, the Court pointedly distinguished Halper because Halper involved a civil penalty and not a tax. Therefore, the inquiry central to Kurth--whether the tax imposed was rationally related to the damages the government suffered--does not apply in the context of an employment termination.

Indeed, assuming as true for purposes of this opinion only, the factual bases for his discharge and for the criminal charges filed against him as set forth herein, Schnittgen's termination was rationally related to the remedial purpose of permitting the Phillips County Sheriff's Office to protect the public safety and property and to promote public confidence and trust in those officers sworn to uphold and enforce the law. That remedial purpose includes, at least, the ability of the government to ensure that its officers do not, themselves, pose a threat to the public's safety, confidence and trust, and to property via the sort of conduct alleged here. Whether the facts recited above actually prove to be true for purposes of any further civil or criminal proceedings involving Schnittgen remains, of course, to be seen. We decide here only that a public employee may be both terminated

23

from his employment and prosecuted criminally on the same facts without violation of the Double Jeopardy Clause.

We conclude that the facts alleged in the instant case are analogous to those in Reed, Payne, and Loui, and we, therefore, adopt similar reasoning.  Schnittgen's termination served the legitimate nonpunitive governmental objectives mentioned above.  While the Halper test does not apply to the instant case, its broad principle of determining whether a civil sanction constitutes punishment by assessing the purposes that "the penalty may fairly be said to serve" provides guidance.  The employment termination in the instant case did not serve the purpose of punishment but instead served the remedial purpose of protecting public safety and property and of promoting public confidence and trust in law enforcement.

Just as importantly, applying the Halper test to the instant case would work an obviously absurd result not intended by the Court.  By holding that the Double Jeopardy Clause precludes the government from both discharging an employee from his employment and prosecuting him criminally for the same alleged unlawful conduct would effectively force the government to elect between two equally repugnant and insupportable courses of action.  The public employer would be forced either to retain the employee in order to prosecute him or terminate him and forego requiring him to answer for his alleged criminal conduct in the courts.  In effect, by committing a criminal act, the public employee would gain job security or, alternatively, immunity from prosecution.  That result

24

would not only be absurd, but the fact that a non-public employee would not have the benefit'of this constitutional Catch-22 would likely implicate equal protection problems, as well.

Accordingly, we choose not to extend the protection afforded by the Double Jeopardy Clause to remedial employment termination situations where the conduct involved also subjects the employee to criminal prosecution. We, like the court in Reed, decline to "offer up the Double Jeopardy Clause as a forum-shopping tool for government employees who have violated the law."

Schnittgen lawfully faced two proceedings based on his alleged actions on the evening of March 29, 1994--criminal prosecution and employment termination. The Double Jeopardy Clause is not implicated. Therefore, we-hold that the District Court erred in its interpretation of the law. Accordingly, we reverse.

_____
                                                    Justice

We Concur:

_____
                Chief Justice

_____

_____

_____

_____
                Justices

25